Next case to be called is case number 12-3308, Consolidated Cases, Rumbin v. Cook County Sheriffs Merit Board. These are consolidated. There were others, there's Verner, Irina, Davis and Cerami. So is everyone here represented? Yes. All right. Okay. Well, who's going to argue? Would you both step up or everyone? Identify yourselves for the record and then we'll talk about time distribution. Patricia Fallon on behalf of Defendants, FLEs, Thomas Start and Cook County Sheriffs Merit Board. Cassidy Casper on behalf of the plaintiffs, Verner, Cerami, Davis, Roman, Herrera and DeSanna. Good morning. I'm Deidre Baumann on behalf of Francisco and Irina. All right. So you're representing everyone in the consolidated cases, Mr. Cassidy, right? With the exception of Irina. That's correct. All right. Now, a lot of these issues are overlapping. How much have you two decided how you were going to address and what time? We have, as we understand it, we have 20 minutes. Counsel can present the primary arguments for 10. I'll take five to address any additional arguments for Mr. Irina with five minutes of rebuttal. All right. Yeah. So we'll do that. We'll have 20 minutes to set. All right? From there, you'll be saving out some time for rebuttal. All right. Mr. Cassidy, you're going to proceed first? Yes. Thank you, Your Honor. Good morning. May it please the Court, counsel for the sheriff. We are here today on seven termination and suspension cases stemming from decisions of the Cook County Sheriff's Merit Board. Of course, the Administrative Review Act and the cases interpreting it provide two-part analysis in these cases. First of all are the particular findings against the manifest way to the evidence. Second of all are the penalties selected for just and sufficient cause. The briefs have been extensive, have extensive discussion as to why the particular findings are contrary to the manifest way to the evidence. I would like to turn the analysis on its head and start with the second prong, which to date neither the board nor the circuit court has given us a square answer to, and that is are the penalties supported by just and sufficient cause. All of the authorities cited in the briefs are crystal clear on the standard. The court has authority to overturn an agency penalty if it is arbitrary and capricious, and we submit that viewed in light of the comparative penalties given to the different officers and other people involved in this case, the terminations and the suspensions are arbitrary. First of all, there were three that were terminated. Two of the three were found guilty of actually lying, were they not? That was the Merit Board's finding. They found that two of the individuals, Mr. Varner and Mr. Davis, as well as Mr. Urena, were untruthful when they denied working secondary employment to OPR. However, we submit that there's no evidence that they were untruthful because there's no evidence in the record that any of these individuals actually were working at the bars in question. There were no employment records submitted. There was no proof of payment submitted. There was no 1099 form submitted in evidence. At most, all you have is Superintendent Holmes claiming that these various individuals were working secondary employment at the establishments. You had an investigator out there that took pictures, didn't you? There was one investigator. Investigator Schroeder sat out there on one night on July 25, 2008. Well, how many nights do you need to be working? I'm sorry? How many nights do you have to be out there to be working in front of the bar or restaurant? Well, that's a fair question, but actually reviewing the record, Investigator Schroeder on July 25, 2008, sits at the bar at one of the establishments for 30 minutes, and he claims to have seen John Verner and Francisco Urena standing at the base of the staircase checking IDs. However, he doesn't ask anybody if they're working there. He doesn't speak to the individuals to ask them if they're working there. But he said they were checking identification. Well, as pointed out in the brief, they could have been volunteering for a private party. They could have been volunteering for a church organization. But this wasn't at a private party location, was it? Well, the upstairs could have been rented out to a private party. The point is, based on the record, yes, we have an investigator who claims to see John Verner and Francisco Urena there on one night, but that doesn't prove that he was working there. That doesn't prove an employment relationship. So we submit that based on if that's all. Is that how we review a decision of this kind? We start looking at the credibility of the witnesses? No, I would agree with you that that would be inappropriate. Is there a standard if there's some evidence to support the decision? Whether it's under the administrative review law or the traditional certiorari, that we would look at whether there's some evidence to support the finding made by the board in this case. That is the standard, and I'm not asking the court to re-weigh the evidence or assess credibility. But the general order with which these individuals were charged with violating, they require evidence of an employment relationship. And I'm not attacking the credibility of Investigator Schroeder. There's no real evidence of an employment relationship with, like, paper documents. There's no statements from the establishment owners stating these individuals were working for me. There's no paperwork, as you indicate. There's no statements from Mr. Verner and Mr. Urena and Mr. Davis that they were working there. There's no admissions. At most, you have one investigator. Probably because it was sort of a two-way street there. The bar restaurants were doing this at probably an amount of money that they wouldn't have to normally do without having to require, you know, any paperwork. So it was kind of like a, you know, two-way thing here. And then you have Holmes saying that they were all, you know, working for him and they would be assigned to whenever it was needed. Of course, Holmes was found incredible, number one. And number two, reviewing his record testimony. What about Holmes was found incredible? Well, the merit board doesn't tell us, and that's another big problem with this case, is the decisions they fail to state any actual specific findings of fact with the exception of finding him incredible, and they don't give us any explanation about that. But second of all, they obviously didn't find him for him. Go ahead. I'm sorry. They obviously didn't find him entirely incredible because they issued discipline with regard to the people that he said were working for him. Well, again, that's one of the problems with the decision, is it seems like the board is trying to have it both ways. In some respects, well, on the face of the decision, they say he's not credible without explanation, but then they do seem to rely on him to issue discipline or to support the discipline in some of these cases. But that brings up the... What did Spagnola and Briggs see Verner doing in Guadalajara? Spagnola and Briggs claimed that they saw Verner and Plaintiff Cerami again on one night, August 25, 2007, and they claimed that they were there on the scene of one of the establishments responding to a fight and that they were wearing shirts that said police. But, again, that's not evidence of an employment relationship. Verner and Cerami, they could have been there, again, as patrons, and then in their capacity as corrections officers. When there was a fight, they responded like responsible corrections officers. So you got that. But then you also have Schroeder sees Verner at Guadalajara doing what? Checking IDs. Okay, so you got the first thing. You got Spagnola and Briggs see them there with their shirt that says police spying a fight. And, by the way, he gave his star number to somebody, right? Yes, he did. Okay, so then you got Schroeder seeing him checking IDs, and then you got Holmes. So you got three things from which, circumstantially, could you say he's working there? No, it's not proof. None of that is evidence of an employment relationship. In his statement to OPR, John Verner admitted he was friends with one of the tavern owners and he would show up there and go dancing and drinking with his wife there. It doesn't prove an employment relationship. What case do you think is the strongest case for your suggestion that there has to be some kind of documentation to establish an employment relationship? I'm definitely not saying it has to be documentation. What I'm saying is there needs to be more evidence than there was in this case of an employment relationship. Is that, again, something you're just throwing out there, or do you have a case that says that there has to be more than what was presented? Well, I'm just relying on the general standards in administrative review that if the opposite conclusion is clearly evident. And you think it's clearly evident that they weren't working at these locations? I think it's clearly evident that on the face of the record in this case, you cannot prove an employment relationship as required by the general orders. They require proof of an employment relationship. You cannot prove that by testimony of two individuals who say, on two nights I saw John Verner and Michael Cerami at all there and present. That doesn't prove an employment relationship as opposed to they're voluntarily as a patron. Are we supposed to completely ignore Holmes' testimony? Because Holmes basically flat out said they were working for him. Right, but Holmes also said that he didn't do any of the recruiting, he didn't do any of the scheduling. That was all done by this person, Tanaka, who didn't testify at the board. In fact, I'd like to switch gears here if I may. The only individual, as I recall, that Holmes says he actually worked with was Christopher Dellutri. And that decision is noted in the appendix to my brief, page 34 and 35. For some reason, Dellutri receives absolutely no discipline in this case, even though he denied working secondary to OPR, even though Holmes says, yes, I worked with Christopher Dellutri. For some reason, he's entirely acquitted by the merit board of all charges. Meanwhile, plaintiffs Verner, Davis, and Urena are terminated. Michael Cerami is given this 180-day suspension, and Roman, Herrera, and DeSena given 40 and 45-day suspensions. Where is the rational basis for the disparate treatment between Mr. Dellutri and the other plaintiffs? Furthermore, we have super- Talk to me about, talk to us about Perez observing Davis at San Marcos. Well, again, I would make the same argument I made before. He sees Davis there on one particular night, and then he claims Davis says he's working an off-duty detail. That's in the record. That doesn't prove he's working at San Marcos. It doesn't prove he's working security at San Marcos. For all we know, he could be working as part of an external operations with the sheriff's office when he says I'm working an off-duty detail. Again, there's nothing in the record that says, for example, Davis told me he's working here at San Marcos. That's not in the record, and that's insufficient evidence to prove an employment relationship. Could we go to Holmes for one moment? It's unclear from the record whether he was temporarily demoted or if he's been demoted to a permanent lesser position. What is the answer to that? Well, I think I have to kind of go outside the record. After the fact, he was returned to a superintendent position. It says somewhere in the briefs it says temporarily demoted. It's in there somewhere. It wasn't in one of the footnotes, but candidly, it wasn't in the record. No, but the record does suggest that the demotion was only temporary. At the time of the merit board hearing, he had not yet been re-promoted back to superintendent, so it wasn't something that could even get into the record, but I would represent that that did subsequently happen. So he got 60 days. And a temporary demotion. So he got 60, and the other two, well, we know that three were fired. Two got the 40 to 45 days. There was one who got a 45 day. One got 100. And Cerami got 180 days. And then Davis, Urena, and Verner were all terminated. Was Cerami the one with the civil suit that didn't notify? Yeah, well, there's another issue. Both Verner and Cerami were accused of being named in a federal lawsuit, which they were, and then failing to notify the sheriff's office. And as argued in the brief. Well, now, what about that one? Are you going to say that something of that magnitude and the sheriff's office is not notified about that, that that's something that deserves a couple of days off? First of all, there's no record evidence that OPR or anyone else at the sheriff's office ever conducted a search to see if they had made notice after they were served. OPR testified at themeritboard.com. I thought one of them indicated on the record that he didn't make the notification he was required to make. Well, both Cerami and Verner told OPR in their statements that they did not make notice, but this is key, the affidavit of service of the lawsuit on both Cerami and Verner is dated after those OPR interviews. So they weren't even served with the lawsuits at the time OPR asked them, did you make service? So they presumably from the record had no knowledge of it at that point. There's also no testimony or evidence at the merit board that OPR conducted a record search after the dates of service. So I submit that with respect to that finding against Verner and Cerami, it is against the manifesto affidavit. What is the notice requirement? How much time are they supposed to have before they notify the sheriff that a suit has been filed against them? To the best of my recollection, I believe the general order just requires notification promptly. Promptly? I don't recall there being a specific time requirement. All right. But, again, after the dates of service, there's no evidence that they failed to disclose at that point. But, again, you know, this case is disparate treatment was argued in the circuit court. It was argued on remand to the merit board. The merit board has never given us an official explanation as to why the disparate penalty is here. Why was Christopher Dellutri completely acquitted at the merit board while these other penalties were meted out? Well, are they required to give you that explanation? And are they ever required to explain to you why the penalty that they imposed is different from another's penalty? Well, I submit that according to the administrative review case law, they need to provide an explanation to prove that the penalties are not being arbitrarily and capriciously meted out in employees involved in similar circumstances as here. And aren't there cases that actually say that this merit board, that the Administrative Review Act doesn't apply? The Administrative Review Act is specifically incorporated in the rules and regulations of the merit board. Isn't that one of the arguments of your opponent, though? They made an argument that the Administrative Procedure Act does not apply to the merit board, not that the Administrative Review Act does. Right. So in the procedures, isn't that where you're getting this requirement or not? No, that's not where I'm getting that requirement. I'm just saying that based upon the Administrative Review case law, they need to provide enough of an explanation to assure the courts that they're not acting arbitrarily and capriciously in issuing their penalties. Furthermore... Well, before you leave that, let's talk, what is it that you think is arbitrarily capricious about the scheme that came out of this, the penalties? Thank you. Well, first of all, we have Holmes, who was admitted to overseeing the entire operation. He gets a 60-day suspension. Then we have multiple testimony from Investigator Schilling from Holmes that the standard discipline for a secondary employment violation is three to five days. That's noted numerous times in the record. So we submit if the standard discipline is three to five days, but Holmes gets a 60-day suspension, what's the explanation for three of these individuals being terminated? Well, maybe the three to five days wasn't appropriate in the first place, considering the allegations. Well, that was just the testimony of OPR, that the standard practice at OPR, at the Sheriff's Office, is to issue a three to five day suspension. Maybe that's where the problem is. The three to five days... The 40 to 45, excuse me. The three to five days, you know, you can relate the three to five days to the 40 to 45 days and say, you know, we've got testimony that three to five days is the ordinary penalty and 40 to 45 days is what we got. And that's the spirit. The terminations are different. And the terminations, I think it's clear that the terminations are based on false statements of the investigators. Okay? So that, you can't compare the secondary employment suspensions of three to five days because the terminations include their finding. You know, you can argue it really goes back to the first issue. That's against the manifest way of the evidence. But as far as disparate penalties, the terminations are based on false statements of the investigators. It's always the cover-up, right? Well, I would submit that we did make the argument that the finding that they were untruthful is against the manifest way of the evidence. Right. I understand that. That's a separate argument. But I don't think you can talk about the three to five days in the same sentence as the terminations. But I think you can talk about the three to five days in the same sentence as the 40 to 45 days. Because in the 40 to 45 days cases, there wasn't any, you know, everybody admitted, they admitted to the investigators that they were working. But with the 40 and 45 day cases, what basis is there to distinguish those from the three to five day suspension case? I'm not saying that, I'm saying you can argue that. I so submit, with respect to the terminations, there's one other point I'd like to make. I mean, there's cases in the brief, the Christensen case, the Kupkowski case, the Baskerville case that all say a falsehood told in an investigation only is just and sufficient cause for termination if it goes to the heart of the employee's duties in their office. I submit, what relationship is there if, assuming that they were untruthful, what relationship is there between saying I did not work this second job and the performance of job duties as a corrections officer? There was no nexus proved up at the merit board between working these second jobs on their own time and how that impacts their abilities and work as a corrections officer. I don't know if I go along with your theory because the function of the sheriff is to uphold the law, isn't it? Isn't that part of their duties? I mean, really? But there's no evidence that... I think that kind of goes to the kind of basic nature of the job, that you don't want people around that aren't going to be truthful in their activities because you have to rely on these people to be enforcing the law, executing the law. And so to say that it doesn't really go to the job, I'm not sure that that's really an accurate representation of what the case means. Well, I think you're also going to hear... I'm sure the sheriff is going to step up here and when she gets her chance, she's going to say that the sheriff has a right to say, I don't want people working, you know, law enforcement officers working in restaurants and taverns unless I give them permission. And there's nothing wrong with that, and that's part of this. It's the deal. It's part of the deal of the job. Then we go to another dimension here. These officers, assuming that they were working, and they did so through the condemnation of their superintendent, Holmes. He was their supervisor. He... Well, you know, the problem with that argument is that that's like saying, our ringleader told us it was okay to do this, so it's okay to do it. But this is not... Because Holmes is outside the law here, too. But there's nothing mail them and say about the particular conduct here. I mean, there's nothing on its face that's morally wrong or unethical. They're working second jobs on their free time with the condemnation of their superintendent. So we submit that should be taken into consideration as well. All right. You're going to run out of time in a minute, and it's only because we've asked you so many questions, but I'm going to have to ask you one more question. It was raised in the briefs that... It was an interesting issue. It was raised in the briefs that all these statements are inadmissible because the... of the nature of the charges and who brought the charges, and therefore under the Uniform Peace Officers Discipline Act, this is all inadmissible. And that goes to your manifest weight portion of your argument anyway. Can you talk about that for a second? Because, you know, they respond that that act is not applicable to corrections officers. Okay. Well, first of all... Yeah, go ahead. First of all, I would note in the appendix to the reply brief, the collective bargaining agreement covering corrections officers and the sheriff's general orders applying to corrections officers incorporate u potas. So whether... Well, I don't really think that that's a sufficient argument to say that they're peace officers because of bargaining agreement or the other document says that this applies. I don't really see how that makes them peace officers. I really don't. Well, I mean, first of all... If that's all you've got, you know, I don't think that's enough. Well, when the sheriff... There are several cases that say they aren't peace officers, but I don't think incorporating something into the collective bargaining agreement makes them peace officers. I would also submit that there's really no evidentiary basis in this record, unfortunately, to make a finding one way or the other if they are peace officers. I mean, there's nothing about their job functions in the record, and so I don't think that this Court has an evidentiary basis to rule one way or the other on that issue in this case. Whereas, like in that Kane County case, there was a sufficient record to say they don't have arrest powers, all that stuff, right? Is it in the record here that the Cook County corrections officers have arrest powers? To the best of my recollection, there's nothing in the record about their job duties at all in this case. Thank you. Thank you, Counselor. Thank you. May it please the Court, I'll try to be brief. First of all, in response to your question, Justice, regarding comparing the types of punishment that has been rendered for not only the secondary employment issue, but also for not being truthful, I turn your attention to Dart v. McGwell-Sasado. That was a decision issued by the Merit Board on July 19th, and they ordered him suspended for only 90 days, and he, too, was accused of making misstatements to professional regulation. So we do know that in that case, we don't know all of the circumstances, obviously, but given those very similar facts, and given that particularly with respect to my client, there's nothing else, it suggests that a termination of his employment is not consistent with what the Merit Board or how the Merit Board treats other people. Now, if this court... So you're saying he should be fired also? We send it back? No. Firing is absolutely inappropriate. This is a later decision, and I assume... Is this a non-related? It's a non-related case, yes. But I'm assuming they made an appropriate decision in that case. In our case, if this court is to give any teeth whatsoever to administrative review, you must do so in this case. You must review the specific allegations against my client and against each of the other appellants, look to the charges, and determine whether or not the Merit Board, whether there were sufficient findings to support the charges against the appellants. Now, are you talking about the manifest weight for the finding that these general orders were all violated by all these people, or are you asking us to direct our focus to the penalty that was imposed for your client? No, counsel addressed the penalty issue. I'm not going to talk about that other than to draw your attention to that dark case because the circumstances appear to be similar. So I just wanted to address that off the bat. But what I'm talking about are the underlying charges. Excuse me if I missed it, but is that dark case, is that before us? Do we have that case? It is attached to Mr. Casper's reply brief. Okay, thank you. And docket number 1636 is the docket number for the Merit Board. All right, so you want to talk to us about the manifest weight with regard to your client? Absolutely. And I set forth in my reply brief the specific charges that were brought against him, and the burden was on the proponent to prove the essential elements of the charges. Now, you made some suggestion that, you know, there is some circumstantial evidence, which is maybe all we have here with respect to Urena, that one item of circumstantial evidence is sufficient to prove an essential element of the charge. And that is inappropriate. Obviously, circumstantial evidence can be considered. But in this case, when you only have one fact, and we do for Mr. Urena, the fact was if you accept, I think it was Investigator Schilling. Schrader. Schrader, thank you. You accept his testimony that Mr. Urena was, for approximately 30 minutes, sitting in front of the stairway that went to an upstairs room. We don't know what was going on upstairs, whether it was a private party, whether it was a family gathering. Absolutely no evidence whatsoever. He was sitting there and just checking IDs. That's it. That's the only fact that we can rely on here. Is that sufficient? So Holmes didn't tie him to this at all? Holmes, I think, did state that he did name him, but it's unclear from the record that I have. What it says is Holmes claimed that there were certain officers who worked in a security service, establishments. He specifically identified Christopher Dellutri, but I don't believe he specifically identified my client. He also testified that he didn't keep any records. He didn't have any IRS statements or anything actually tying my client to the, quote, to hire the officers. Now, the record, we don't have anything from Tinoco stating that my client was working. And this is really critical. The only thing that justifies his termination is the assumption that he lied to professional standards, that he lied. But what if he didn't lie? All he said was I wasn't working at Guadalajara on that date. Well, and the thing is, is that this interview, he wasn't even asked, well, what were you doing? Exactly. I mean, it said, were you working? And he said, no. Well, they know that he was there, right? And, as you said, observed for a half an hour checking IDs. And this investigator didn't say, well, were you checking IDs? And why were you checking IDs? Absolutely. Absolutely. It was silent. The record is silent as to what he was doing there. And I frankly don't know why. And I said in my brief it would be a different circumstance if he had been asked those questions and it had been shown that he lied. But here, it absolutely, there was, you can say he lied if you believed he was actually working. But, you know, he claims he wasn't and he said he wasn't. Well, what would he be doing, checking IDs at the door there, or at the stairs? Well, for instance, if it was some sort of family function or neighborhood. Yeah, but where would we be getting that from? Where would we get that inference from? You're asking us to, I mean, there's nothing in the record that suggests what you're saying. Now, there is a lot in the record to suggest that these sheriffs were working at a bar without, you know, the sheriff's approval. They were working at a bar or a restaurant that has, part of its business involves the sale of liquor. So, I mean, you're asking us to take something we could if you had something to back that up with. But there's nothing in the record to suggest anything about private parties or family gatherings or anything like that. Except that is not. So, how could the board pick that up if there's no evidence to suggest that this facility had upstairs private parties in the second floor all the time? There's nothing like that in the record. The point is there's nothing in the record to suggest anything other than he was sitting there. And you have to. Well, there's actually evidence in the record to show he was checking IDs, which is what a lot of people do at bars. There's, you know, security hired for that very purpose. They check IDs to make sure that the people coming in are old enough to be served alcohol. Okay. So, but, I mean, I understand your position. But there's nothing in the record that would suggest an inference like you're making. Who has the burden of proof? My client does not have the burden of proof. Sure, I agree with you there. But the point is there was lots of evidence about what was going on in terms of this other employment without the And I'm just saying, there's nothing in the record, though, that suggests that they should have drawn the inference that you're throwing out now that this was a private party upstairs. What I'm saying is, and I respectfully disagree. I think you've made a very good point, though, that the amount of evidence that's here is about as slim as it gets. Because the question that he was asked was, were you working that night? And he said no. Right. All right. And the only other evidence was that there was testimony that he was observed at the door, looking at what it looked like to be checking IDs. Okay. What did Holmes say about Mr. Urena? You know, I don't. You said there was really very little. There was very little. And certainly, I couldn't find it in the record quickly enough. But my recollection was that he specifically identified Christopher Dellutri. But he did not specifically identify my client. And, of course, then we Well, most of what Holmes said was hearsay anyway.  Because it came from another person. From Tinoco. Yeah. Tinoco. Yeah, no, absolutely. And the only credibility determination the board actually made was that Holmes wasn't credible. Now, that's part of the problem that we haven't really discussed. When you look at the decision, you know, what are we reviewing? Well, I think we'll have some questions for your opponent regarding the penalties that were imposed in this case. Right. Can you compare it, like, your client to Holmes? Holmes, who was the mastermind of this, who clearly was performing, I believe, illegal work. And he's working. He's getting money. My client, who had an unblemished record for ten years, no discipline, nothing is, you know, is terminated. And his life turned upside down. But just to sum up, because I know I'm going over, I disagree that there is a lot of evidence, as your Honor stated, suggesting that he was working. Well, I said there was evidence regarding the individuals. And when you put it all together, there is evidence to support an inference regarding each one of these individuals as to whether or not they're working. Now, the degree differs with each person. Exactly. The degree differs to each person. And I would also submit that even assuming he was checking IDs and maybe there wasn't a private party, maybe they were – how does that show he was working? How working implies getting some sort of consideration, some sort of money, some sort of benefit? Did he know these people at the bar? Did he get any money? For my client, this was one occasion for half an hour. So what was he doing? Also, unlike the other appellants, he had no indicia of being security. He had nothing on his T-shirt. He had nothing. He didn't have his badge. Nothing indicating that he was working as security. So they have not met their burden of proof, particularly with respect to Thank you. May it please the Court. Counsel, my name is Patricia Fallon, and I represent the defendants, appellees in this matter, Cook County Sheriff Tom Dart, and the Cook County Sheriff's Merit Board. As an initial matter, counsels have already summarized some of the facts, so rather than being redundant, I'd like to go directly to the line of questioning regarding the discipline that was issued, the discipline that was issued to each plaintiff, and whether or not that discipline was arbitrary and capricious. I think that the most important factor in reviewing the discipline is looking at which officers cooperated with the Office of Professional Review, which I'm going to refer to as OPR this morning, and which officers voluntarily gave statements and acknowledged their participation in this unauthorized secondary employment, and which officers repeatedly lied or provided false statements to OPR regarding their involvement. And the three individuals who were terminated are the three that chose not to participate and, in fact, chose to provide false statements to OPR. That would be Urena, Verner, and Davis. If you look at the discipline in its totality and you look at what was issued to each plaintiff, each plaintiff correctional officer, you will see the reasoning that the Merit Board put into issuing the discipline that it did. There has been discussion this morning about three to four days, I believe it was, or three to five days for the commission of secondary employment, unauthorized secondary employment, and that is not the testimony that was in the record. The testimony was by the investigator that he had seen in his 30 to 50, I believe, investigations. He had seen three to four days or three to five days. He had also seen up to and including 40 days. And he also testified that the customary discipline for lying to OPR or providing false statements can be and usually is termination. Well, how does Mr. DeSena get 45 days when Holmes, who put the whole thing together, gets 60? How can that possibly be justified? And a temporary demotion. Well, I'll start with Holmes, if that pleases the court. Holmes was demoted and did incur a 60-day suspension. To my knowledge, and again, this is outside the four corners of the record, the demotion lasted for approximately one year. And I don't know the facts that led to him being reappointed as a superintendent, but he did, in fact, counsel as correctly represented that he did become a superintendent later, and it was one year that he was demoted to the position of chief. The distinction between Holmes and DeSena would be that they both cooperated. Once called in by Sheriff's OPR investigators with the knowledge that an investigation had been done or was ongoing, they both cooperated and provided information. Holmes, for his part, identified all of the officers that were part of this ring of secondary employment, himself included, and voluntarily identified who had worked at various establishments, how many times he had observed them, and so forth and so on. DeSena didn't have any of the other additional violations against him, such as failure to report a civil complaint, failure to report an altercation that involved police activity, failure to report having signed a refusal to press charges form. And in addition, he didn't lie about his participation. He admitted that he had worked security at both – He admitted that he wore his badge around his neck while working security, and he admitted that he never submitted the secondary employment forms as required by the general order. I think that the distinction between the two that you've asked me about, Holmes and DeSena, would be that they participated and did not obstruct the OPR investigation. Holmes did incur a severe penalty, I would argue, with a 60-day suspension and with a demotion from his position of superintendent. There's no dispute that he was involved in this and that he was – Well, is there any dispute, though, that he's the one that got all these other people involved? I believe the record is clear that he was the one that was organizing these correctional officers to work security at these locations. Yeah, and so he gets 60 days in the demotion. And then let's just talk about Urena. Okay. Is there any evidence other than the one evening that put him at this restaurant location? Well, the one evening that we've discussed, July 25, 2008, in which we've already discussed this morning, Urena was observed by Investigator Schroeder while Schroeder was conducting surveillance. Urena was observed checking IDs for approximately 30 minutes. Okay. Is that the only day that is established in the record? I believe you're correct that that is the only date relative to Urena that is in the record and is at issue. However, what has not been mentioned this morning is that Investigator Schroeder, in fact, took a photograph and photographic evidence was admitted into the record before the mayor board of Urena checking IDs on this date at this location. Well, when you say a photograph, it's a still photograph, right? Yes, it is. All right. And he obviously is standing there and then someone else is in the picture and he's looking at something? Is that what you mean? Yes, that is correct. That's what I'm referring to. Well, what about the 90-day suspension for this other individual by the sheriff's merit board who was also found guilty of not being truthful before the court or for the investigation, rather? Are you referring to the 180-day suspension? No, the case that – The one that's in the appendix. The case that counsel is referring to, which I believe she stated came down after, I believe it was Dart, but I don't have it in front of me. Well, Dart v. Cecilio. I'm not familiar with the facts of the case that she's referring to. I believe it was part of Appellant's reply brief, I believe she stated, and it was a case that was later in time from these matters and involved secondary employment, but I don't know. Well, if it was so significant, I don't understand why Holmes gets what might be a slap on the wrist and then another individual who's worked for the sheriff for 10 years and there's one incident where he says, I wasn't working that night. If it was so significant that it interfered with the investigation, why was Holmes given a 60-day suspension and the other individuals fired? Well, Urena and Davis are distinctive from Holmes. In the case of Holmes not having been charged with failure to report, a civil lawsuit having been filed against him. I just want to focus on Urena right now. Okay, Urena. I would argue that Urena- He wasn't the one that was involved in a battery, right? Correct. He wasn't the one that had a civil suit filed against him. He was not. He answered no to a question about whether you were working at Guadalajara or whatever location it was on a given day. That is correct. He answered no. And I would argue that if- So he should be fired after a 10-year career without any prior incident and Holmes, who basically corralled everybody in to doing this thing, which was improper, he gets 60 days. Well, in the termination of the marathon, Urena lied to the Office of Professional Review and Holmes did not. Urena lied when he was questioned, I believe on two occasions, even when presented with the evidence before the marathon, he consistently maintained a position that he was denying that he was ever involved. What were the two falsehoods? The first falsehood- One was the question where he said I was- No. To the question, were you working at that place on this night, he said no. What was the other one? Correct. That was when the OPR investigator called him in to give the statement. I would argue that the second opportunity that Urena had to put forth evidence, as has been done in the reply briefs here, that he was maybe working for a private party, that opportunity arose before the marriage court. A full marriage court hearing was held, and all seven of these plaintiffs were afforded the full opportunity to put on evidence or witnesses- So this is, you're saying an omission? He failed to- He didn't put on any case at all. None of them did. You're saying that's a falsehood. I'm not saying that that's a falsehood, but I'm saying that I think it's improper at this stage to raise this new theory that he was working a private party on that date in question- The question is how do you validate the punishment to Holmes versus that given to Urena? The way I would validate it on behalf of the Sheriff's Department and the marriage court would be providing false statements to OPR. The Sheriff takes that charge extremely seriously. As has already been addressed this morning and discussed, it's of the utmost importance that the Sheriff of Cook County can rely that his correctional officers and his sworn officers are not going to willingly lie on your oath, that they're going to provide truthful statements when called upon by the Sheriff in various instances or capacities that can arise. Let's talk about the fellow that the board determined didn't violate anything. He was not sanctioned. He wasn't- what is his name again? DeRudy? I believe it was DeLuty or DeLutry. DeLutry, yeah. What can you tell us is the basis for the board's decision on that one? You know, DeLutry not being part of the seven plaintiffs that we're dealing with here this morning, the marriage court having found there was no evidence against him and there was no discipline issue against DeLutry, I think it's- With DeLutry, they didn't have any evidence against DeLutry because all they had was Holmes saying that this other guy told him that he worked for me and nobody observed him working. And I think that was why- So there was just no evidence against him. What do we take from the board's- and I think that's a sufficient answer for just to apprehend yourself. What do we take from the board's finding that Holmes was incredible? While you're taking a drink, that is like kind of the most mysterious thing in the whole thing. I mean, Holmes, as you say, cooperates in the investigation, names everybody, and yet the marriage court finds him incredible. So what are we supposed to take from that? And what of Holmes' testimony are we supposed to say is probative and material, and what is it not? What is it not? And to add one more thing, if he's incredible, why wasn't he terminated? If someone else is determined to be untruthful and the board across the, you know, says, well, he's incredible, but that he gets a 60-day suspension for being incredible or not believable or I guess you could say not truthful. Well, Holmes' discipline was not issued by the marriage court because not having a marriage court ranking as a superintendent, he would not go through the marriage court process. So he didn't-he wasn't part of this hearing of these seven officers. Okay, but can't we take any-thank you for that because we didn't know that. But can't we take that into consideration, though? Now Justice McBride has made what I think is a major point, and that is that the whole basis for these terminations is that there was untruthfulness to the investigators and during the investigation. The marriage court said that Holmes was incredible. So why isn't he fired? Well, again- The marriage court said that he was now a chief. He was incredibly lied to the marriage court, and now he's a chief. How do we square that with these three gentlemen getting terminated? Well, I wouldn't make the leap on behalf of the defendants that he lied to the marriage court. Well, what does incredible mean to you? I don't dispute that we can't rely on Holmes exclusively here. I think there was ample evidence in the record that these-specific to the individuals who were terminated, that there was ample evidence for their violations of those general orders and the terminations were warranted based on the past practice of the sheriff and how they issued discipline for those violations. In terms of Holmes having not gone through the marriage court process and his discipline not having been pursuant to a marriage court hearing, he was a witness in this matter. He was called as a witness for the sheriff and participated in the OPR investigation and participated- So back to my original question. I'm sorry to interrupt, but back to my original question. When we're looking at the manifest way of the evidence, when we do that analysis, what do we do with Holmes' testimony if the marriage court finds him incredible? Does his testimony implicate all these people or should we just toss it away? What part of it should we toss away? I mean, marriage court, what is it that you found incredible? He cooperated. He said that everybody worked for him. Was it the fact that it was through an intermediary? Was it? What was it? Well, I think when you look at the totality of the evidence that was put forth before the marriage court in addition to Holmes, such as the testimony of the officers from Berwyn and Cicero, the testimony of the OPR investigators, the surveillance that was done, the photographs that were taken, and the other sheriff's correctional officers who were part of this secondary employment ring and testified as to who else was involved in it, when the marriage court looked at the totality of those factors and weighed the credibility of the witnesses and the totality of the evidence, in their determination, I can't speak to what part Holmes' testimony played in that, not being in the marriage court's head, but I don't dispute that they did state that his testimony was incredible, and I think that there's still ample evidence in the record to support the determinations that were made, specifically determinations that were incurred by Urena, Davis, and Verner. I think that the testimony, there was no less than five witnesses called by the sheriff, all of them law enforcement personnel, and I think the sheriff's investigators in conjunction with those Berwyn and Cicero police officers provided enough evidence to the marriage court to support the violations of the general orders. What did the Berwyn and Cicero police officers give us? What did their testimony give us? Their testimony. I apologize. There are seven plaintiffs, and I have to refer to my notes to make sure I don't miss anything. It's very complicated. Let's see. Officer Michael Spagnola, Berwyn patrol officer, who responded to the disturbance that involved Cerami and Verner, and this was the disturbance that eventually resulted in a civil complaint being filed against them. Spagnola testified that it was Verner and Cerami who voluntarily identified themselves as Cook County Department of Corrections officers, gave their star numbers, and I think that his statement in terms of what occurred on that date in question, I believe it was August 25, 2007, supported what Investigator Schilling had already determined from his investigation, that both of these individuals were working security at this location, identifying themselves and holding themselves out as Department of Corrections officers, and in fact in question went ahead and gave their star numbers in relation to those questions. Well, there was an altercation, right? There was an altercation involving a private citizen who alleged that Verner and Cerami physically forcibly removed him from the bar and banded him, and later that individual by the name of Pineda filed a civil lawsuit against both Verner and Cerami. Neither Verner nor Cerami ever notified the sheriff about the civil lawsuit. Yes, but they identified themselves to Spagnola and gave, or at least Verner gave his star number. That is correct. Well, does that necessarily, does that mean I'm working, or does that just mean, hey, I'm a police officer, here's my badge number, or I'm a corrections officer, here's my badge number? I mean, he didn't admit to Spagnola that he was working, did he? I don't know if he admitted to Spagnola that he was working. I don't have that. If they get back up, they can answer that. Do you agree with counsel that the OPR investigation took place before the service of the lawsuit on these two, Cerami and Verner? I believe that, I don't know that the OPR investigation was completed before the service of the lawsuit. I believe counsel is correct that the state sent an issue. Well, the interview, the interview when they were asked, took place before the lawsuit had ever been filed. That is correct. That is what is indicated in the record, according to the service date on the complaint. Well, then how is there notice? Why would they be giving notice at the time of the interview? If they don't even, if the lawsuit hadn't been filed. They're under an obligation as sheriff's employees to give notice the minute that they receive notice of the lawsuit. And I don't think there's evidence in the record that that occurred after the OPR investigation had been completed or that that occurred after the merit court proceedings were actually held. Okay, well, they said it was promptly. You're saying it was they had to give notice immediately? That general order is not an issue in this case, but I believe you're under order to report as soon as possible upon notification of a civil lawsuit against you to report that to your superiors and to make the sheriff's office aware of that. Well, is there evidence in the record that that didn't occur? If they're saying that they didn't get service? That did not occur. They never gave notice to the sheriff's office regarding that civil lawsuit. Well, their claim is that at the time of their interviews that they had not yet received notice. You're saying at some point they got notice and they never? That is correct. That is what I'm saying, yes. But isn't the allegation that they weren't candid at the time of the interview when they didn't? Well, they have an independent obligation, whether they're candid or not. They have an independent obligation to notify the sheriff that they got sued. They do. At some point. And we don't know when they actually were notified of the lawsuit. All we can rely on is the date of service that has been put forth in the record. But on the date of the interview that you're asking about, there were numerous things that they were not candid about in terms of working secondary employment, that incident that we've discussed now regarding the civil lawsuit, and in addition, being part of this group of individuals who routinely work secondary employment at the establishment in question. Well, you're going to have to sum up. Okay. Unless there's other questions right now. I believe that the arbitrary and capricious arguments have been thoroughly made. I would submit that the standard of review as an initial matter is for the plaintiff to provide evidence that the decisions of the merit board were against the manifest way to the evidence, and I don't believe the plaintiff can meet that burden. I think there was ample evidence in the record to support the determinations made by the merit board, and it would only be if the plaintiff could demonstrate that those decisions were against the manifest way to the evidence that we move on to were the sanctions arbitrary and capricious. And I think that through all of the arguments here this morning, there has been demonstration of ample evidence in the record to support merit board findings and a thorough analysis of why the sanctions were issued and why the determinations were made relevant to each plaintiff. What's your position with regard to this problem of them getting inadequate warnings under the Uniform Peace Officers Disciplinary Act? My position regarding the Uniform Peace Officers Disciplinary Act, or UPODA,  and the mere fact that it is referenced in the collective bargaining agreement. It's not just referenced in the collective bargaining agreement. It's incorporated. Here's my question with regard to that. Can the county or the sheriff or whoever does this, sit down with the union and make a deal and say, this is part of your contract. We agree that if we go into a disciplinary proceeding, we're going to apply. These officers are going to have the benefit of the Uniform Peace Officers Disciplinary Act. And then when it actually happens, you can say, no, it doesn't apply. I mean, how can you do that? How can you agree on the one hand when you make your contract deal that we're going to consider them peace officers for this act, and then when it actually happens, say, no, we didn't mean that. Well, I would agree that the merit board proceedings are separate and apart from whatever is incorporated within the collective bargaining agreement. And the fact that UPOTA is incorporated in their collective bargaining agreement does not then translate to the merit board is bound by UPOTA. The merit board is empowered by statute, and these officers were given due process through the merit board proceedings. They were notified of the charges. They were given the opportunity to have counsel present, and they were called in for statements according to the merit board. So that's just kind of like the fact that the county agreed or the sheriff agreed to put that in the collective bargaining agreement and has no force of effect. I don't think that it binds the merit board. I don't think that anybody beyond the legislature can bind the merit board to include these correctional officers under UPOTA. The merit board is created how? The merit board has jurisdiction by statute, by Chapter 55 of the Illinois Compiled Statutes. And the merit board, their authorities are defined within the statute. They are not bound by whatever is incorporated within the collective bargaining agreement. There is a grievance procedure available under the collective bargaining agreement if any individual correctional officer or any of these plaintiffs feel their rights were violated under the collective bargaining agreement, they can file a grievance. So they can file a grievance. Correct. Let me ask you one more question with regard to that. Just as a fallback, and I know you're not going to want to take this, but I noticed that in each of these statements that the officer was asked, let me find it, I'm sorry, at the outset of the statement, have you been presented with a notification of allegations form? And the answer was yes. What's that? A notification of allegations form. Has that been placed in our record? That should be in the record. I know it should be, but is it? Well, you know, I don't have that in front of me, but that is in every merit board case that I've ever owned. Because we couldn't find it. You couldn't, okay. Well, I shouldn't say that. My clerk couldn't find it. Okay. It's a single sheet of paper. It is always presented and part of the OPR investigation file. And it is the first step when the officer or the accused is called in for a statement. They are presented with a notification of rights form in which they are made aware of their rights. They sign that form. I'm not talking about that. I'm talking about notification of allegations. That's what it says. It says, have you been presented with a notification of allegations form? Which to me, since I don't know what it says, but it would kind of suggest that this is the form that they gave them to say, this is what the allegations are against you, which would then comply with the Uniform Peace Officers' Disciplinary Act. But we don't know that? I don't. Okay. Without immediate recall of all seven records, I don't know that those forms were included. Okay. I know the notification of rights would be included, but if that's something distinctive, notification of allegations, I'd have to look at that. I don't have that in front of me. Okay. Thank you. Thank you. And I know I'm out of time, but in conclusion I would encourage this court to review the Merit Board findings carefully because the Merit Board did issue appropriate and proportionate punishment for each of the officers involved in working secondary employment at the Berwyn and Cicero bars, and this court should thereby affirm the discipline imposed by the Merit Board. Thank you. Thank you. Brief rebuttal. Thank you. The colloquy has been extensive here. There's just a few points of clarification I want to make. Your Honor is correct. The direct quote from the record as to Officer Spagnola is he says, I didn't ask the men, Verner and Cerami, if they were working there. I believe they were working there. So you have evidence from Spagnola that Verner or Cerami admitted to working there. Briggs, Officer Briggs, says the same thing. He admits he does not have any conversation with John Verner. He doesn't ask his supervisor or manager if they were working there, and no one in his report does it say that they told him they were working there. So basically this is all about, by the way, sorry to break your train here, but about whether Mr. and Officer Roman was an auxiliary officer. No, this is specific to Spagnola and Briggs. I've got a note here that Briggs observed Roman, Officer Roman, working as a Berwyn auxiliary officer. He did testify that on a prior occasion Roman had been working as an auxiliary police officer with the city of Berwyn. But, again, you know, why is that worthy of a 40-day suspension in the case of Mr. Roman? And we also indicate that if that answers your question. It does. Go ahead. I'd like to move on. There was also some questioning about how can we draw an inference from the record that Urena and Verner were there for a private party? Will we submit how can we draw an inference from the record that they were there working as opposed to being a patron as opposed to helping out at the local church charity event? Again, it doesn't come down to documentation. It comes down to Schroeder says, I saw these two individuals there on one night for 30 minutes. He doesn't testify that they were in uniform, that they were wearing security shirts. How can we draw an inference from that that there was an employment relationship? And we have the same problem with Spagnola and Briggs. They basically just testified, I saw Sir Amy, I saw Verner there on one particular night, and we have the same problem with Cicero Officer Perez's encounter with Davis on 4-19-2008. He merely testifies, I ran into Davis at one of the establishments. Davis says, quote, I'm working in off-duty detail, but he doesn't say I'm working at San Marcos. He doesn't say he's working at a bar. Again, he could have been working for the sheriff's office in an off-duty operation according to the state of the record as we have it. Wouldn't he have testified to that at his hearing? I'm sorry? I was working for the sheriff on the off-duty day. Well, for whatever reason, Davis, none of the plaintiffs in this case testified at the merit board hearing, so we don't know how Davis would have testified, but it is the sheriff's ultimate burden to prove by a preponderance of the evidence that these individuals were working. And for Davis to state to Cicero Officer Perez, I'm working in off-duty detail, that proves nothing about whether or not he's working in one of the establishments as opposed to the sheriff, as opposed to something else. So to tie all that up, there's no record evidence to draw any inferences about what these individuals were doing there. Lastly, I just want to touch briefly on if, in fact, the distinguishing characteristic between the terminations and the suspensions is cooperation or being untruthful, the question has to be asked, why then did Miguel Saucedo in this July 2013 decision, he's found to have lied to OPR when he denied taking a handgun and a flashlight into a bar. The merit board found he lied about that. He gets a 90-day suspension. So if that's the distinguishing characteristic, why wasn't Mr. Saucedo terminated? So the disparate treatment in this case is extremely problematic. As well, on that same point, I'd like to talk about Officer Dellutri. Your Honor, he asked a question about was there any evidence that he was working. Actually, Holmes, Officer Dellutri is the one officer that Holmes says, I personally worked with Dellutri at these bars on several occasions. I believe he's the only officer that Holmes stated he had personal knowledge of him actually working there. Yet, Dellutri is entirely acquitted. And, by the way, Dellutri denied working secondary to OPR. Yet, he's entirely acquitted, and we, from the state of the record, can't tell why. Last point, we would indicate, you know, there was no consideration in this case for the fact that John Verner had a six-year career with the Sheriff's Office, and there was no proof of prior discipline. Serrani had a nine-year career, no proof of prior discipline. Davis had an eight-year career, no prior discipline. And, by the way, these officers all worked in specialty units. Roman had a ten-year career and no prior discipline. Herrera, five years, no priors. DeSena, 20 years and no priors. There's no consideration in the record at all for why these huge suspensions and terminations are justified in light of their otherwise good career service. So, with that said, we request that the case be submitted under advisement unless there are further questions. All right. Thank you all. The case was well-argued, well-briefed, and we will take the matter under advisement.